[No. S037753. Mar. 2, 1995.]

INTERNATIONAL ENGINE PARTS, INC., et al., Plaintiffs and Appellants, v.
FEDDERSEN AND COMPANY, Defendant and Respondent.

## COUNSEL

Thomas Kallay for Plaintiffs and Appellants.

Garrett & Tully, Stephen J. Tully and Kevin S. Lacey for Defendant and Respondent.

Pettit & Martin and Robert L. Maines as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**LUCAS, C. J.**—We granted review to resolve a narrow, but recurring, issue as to when *actual injury*, caused by an accountant's negligent filing of tax returns, occurs so as to commence the running of the two-year statute of limitations period of Code of Civil Procedure section 339, subdivision 1 (hereafter section 339, subdivision 1). A cause of action for accountant malpractice under section 339, subdivision 1, specifically accrues "on discovery of the loss or damage suffered by the aggrieved party," but until the client suffers damage or actual injury from the negligence, a cause of action for professional negligence cannot be established. (*Schrader* v. *Scott* (1992) 8 Cal.App.4th 1679, 1684 [11 Cal.Rptr.2d 433] [hereafter *Schrader*].) Some Court of Appeal decisions hold that actual injury in accountant malpractice cases occurs on final tax deficiency assessment. (See e.g., *Moonie* v. *Lynch* (1967) 256 Cal.App.2d 361 [64 Cal.Rptr. 55] [hereafter *Moonie*].) The Court of Appeal herein employed a different measure, holding that actual harm occurs when the client learns, on receipt of a preliminary Internal Revenue Service (IRS) audit report, that the accountant's negligence *may* lead to imposition of tax deficiencies.

As we explain, IRS procedures support a rule commencing the limitations period of section 339, subdivision 1, at the time the IRS actually *assesses* the tax deficiency. (*Moonie, supra,* 256 Cal.App.2d at p. 364.) Prior to the penalty assessment, the preliminary findings of the auditor as noted in the

audit report are merely *proposed* findings, subject to review and negotiation. We are persuaded by decisions of the Court of Appeal, the majority of sister state jurisdictions, and the federal circuit courts, that actual harm occurs on the date the tax deficiency is assessed. Accordingly, we will reverse the Court of Appeal's judgment herein.

FACTS

The relevant facts are not in dispute. Plaintiff International Engine Parts, Inc. (IEP), hired defendant Feddersen and Company (Feddersen) to perform accounting services in 1969 or 1970 for IEP. After IEP's subsidiary, plaintiff I.E.P.O., Inc. (IEPO), was incorporated in 1974, Feddersen prepared IEPO's 1983 and 1984 income tax returns. IEPO relied on Feddersen's advice in signing and filing those returns.

IEPO, an export company, was incorporated as a "domestic international stock corporation" (DISC). IEPO's DISC status gave the company certain tax benefits in the form of deferred income so long as it satisfied the requisite requirements of the Internal Revenue Code. (Int.Rev. Code, § 991 et seq.) Among the requirements for maintenance of DISC status were the proper documentation of loans made by the exporter IEPO to the producer IEP ("producer loans"), and intercompany pricing agreements. Feddersen failed to provide the necessary documentation for the 1983 and 1984 tax returns.

In 1984, the IRS audited IEP's income tax returns. Sometime prior to May 1985, IRS Agent Carol Binner audited the DISC status of IEPO. In connection with the audit, Feddersen informed IEPO President Elmo Iadevaia, that his firm "just forgot or missed" the required document filing and Feddersen agreed to continue representing IEP and IEPO in the hope that it could mitigate the extent of its alleged oversight.

In 1986, Binner advised Iadevaia that because Feddersen failed to provide the proper documentation relating to "producer loans" for 1983 and 1984, it would be disqualified by the IRS as a DISC. Several people involved in IEP, IEPO, and related entities, including plaintiffs' controller and tax expert, Russ Piti, also advised Iadevaia that they believed Feddersen was responsible for the missed filing, and that Feddersen was directly responsible for the disqualification of DISC status during the course of the IRS audit. Iadevaia discussed these comments with company attorneys.

Soon thereafter, Feddersen informed IEPO that the company's federal tax liability for the years 1983 and 1984 could be in the range of $300,000. In

response to this information, Iadevaia authorized a company attorney to write a letter, dated July 14, 1986, withdrawing a settlement offer in unconnected litigation then pending against IEPO. The pertinent portion of that letter stated: "I have just been advised by Elmo Iadevaia that he is compelled to withdraw his offer of settlement set forth in my letter to you of June 16, 1986. He has now learned that the Internal Revenue Service, as a result of [its] audit, has decided to disqualify IEPO as a DISC corporation for the tax year 1983. The effect of this is the loss of the forgiveness of the accumulated earnings and creates a tax liability for IEPO in excess of $300,000." At the same time, the bank in charge of handling the company's accounts reduced its line of credit from $600,000 to $400,000 so that if a tax assessment was made against IEPO, the company could meet its liability to the IRS.

The IRS issued a preliminary audit report to Feddersen in June 1987. The report indicated the IRS planned to disqualify IEPO as a DISC and impose tax deficiencies, interest, and penalties against IEP and IEPO for the years 1983 and 1984. The amounts were calculated and set forth in the report, which was then forwarded to Iadevaia. Feddersen, on behalf of IEP and IEPO, requested and was granted "Special Consent to Extend Time to Assess Tax" relating to the finalization of the audit because another related entity, ASCO, recently had been audited and was expecting a refund of $250,000. IEP and IEPO needed this refund to help meet the anticipated IRS assessment. The audit was finalized on May 16, 1988, when the deficiency was assessed and taxes and penalties were imposed.

IEP, IEPO, and the Iadevaias filed the present action against Feddersen for accountant malpractice on May 15, 1990. This filing occurred four years after the companies were first advised by IRS agent Binner that IEPO probably would be disqualified as a DISC for failure to file the proper documentation relating to producer loans, nearly three years after the preliminary audit report was prepared, and one day short of two years after the tax deficiency was assessed. Feddersen sought summary judgment on the ground that the action was barred by the two-year limitations period of section 339, subdivision 1, because actual injury due to Feddersen's malpractice occurred no later than 1986, when IEPO was forced to withdraw its settlement offer in the unrelated lawsuit based on the disqualification of DISC status, and when the company's bank reduced its line of credit by $200,000 as a direct result of the predicted tax liability. Feddersen also claimed that IEP's and IEPO's payment of attorney fees for representation throughout the audit amounted to actual injury that commenced the running of the statute of limitations under section 339, subdivision 1.

IEP and IEPO opposed summary judgment, arguing that actual harm occurred, and the limitations period of section 339, subdivision 1, should commence, when the deficiency was assessed on May 16, 1988, because the IRS could not have assessed tax deficiencies before that time. IEP and IEPO asserted that any estimate of taxes due prior to that date was purely speculative and subject to modification.

The trial court granted summary judgment for Feddersen and the Court of Appeal affirmed, concluding that the fact that federal tax law would not allow the IRS to issue a binding tax assessment to IEP and IEPO until the deficiency was assessed had no legal effect in determining when the corporations first suffered the actual injury resulting from Feddersen's alleged malpractice. The court held that plaintiffs suffered actual harm in 1986, when their line of credit was cut by $200,000, or, at the latest, in June 1987, when the IRS issued the preliminary audit report. Either way, the court concluded, the action was time-barred by section 339, subdivision 1.

■ The dispositive issue in this appeal, therefore, is whether actual harm occurred prior to June 1987, when IEP and IEPO had sufficient information to put the companies on notice that Feddersen's negligence in failing to file proper DISC documentation in preparing IEPO's 1983 and 1984 tax returns would probably disqualify the company for DISC status, or on May 16, 1988, when the IRS assessed the deficiency and penalties in the form of additional taxes and interest levied on the companies. Feddersen claims that in addition to notice of its alleged negligence, the fees paid to it for work on the audit, the "nominal fees" paid to IEP and IEPO attorneys, and the impairment to cash flow from the reduction of IEPO's credit line together constituted actual injury which arose well before May 16, 1988. By contrast, IEP and IEPO assert that until the tax deficiency was assessed in 1988, no actual harm occurred because the IRS could not assess or collect any taxes or penalties prior to that date. IEP and IEPO readily admit they knew the IRS was auditing their returns for tax deficiencies, but they observe that before a deficiency is assessed, there can be no finding that the costs associated with the audit are due to the accountant's alleged malpractice; those costs may be incurred for the purpose of responding to a routine audit by the IRS.

### DISCUSSION

We consider the issues following the grant of a summary judgment motion. ■ Because the relevant facts are not in dispute, the application of the statute of limitations may be decided as a question of law. (*McKeown*

v. *First Interstate Bank* (1987) 194 Cal.App.3d 1225, 1228 [240 Cal.Rptr. 127] [hereafter *McKeown*].)

### 1. *IRS Deficiency Assessment Procedures*

In order to better understand why the limitations period necessarily commences no earlier than the date of deficiency assessment in cases involving the negligent filing of tax returns, it is helpful to review IRS procedures for examination of tax returns and assessment of tax deficiencies.

Once a federal tax return is selected for audit, the examination is performed by an IRS examiner. At the conclusion of the examination, the taxpayer is sent a report of the examiner's findings, indicating any proposed deficiency assessments. If the taxpayer agrees with the findings of the examiner, he or she will sign the appropriate forms (form No. 4549 and/or form No. 870) acknowledging the tax liability. (*Holland* v. *C.I.R.* (4th Cir. 1980) 622 F.2d 95, 96.) If the taxpayer signs the agreement form, he or she immediately (1) waives the required statutory notice of deficiency pursuant to Internal Revenue Code section 6212 (the 90-day letter), (2) waives the corresponding prohibition on collection for 90 days under Internal Revenue Code section 6213, and (3) is thereafter precluded from litigating the proposed deficiency in tax court. (Int.Rev. Code, §§ 6212, 6213; *Mills* v. *Garlow* (Wyo. 1989) 768 P.2d 554, 556 [hereafter *Mills*]; see also *Robinson* v. *United States* (3d Cir. 1990) 920 F.2d 1157, 1158 [explaining that notice is pivotal in IRS assessment procedures because it serves as prerequisite to valid tax assessment].) If the taxpayer does not agree with the examiner's proposed findings, the findings will be reviewed in the district office, and the taxpayer will be sent a "30-day letter" instructing that the taxpayer has 30 days to file a protest. (*Mills, supra*, 768 P.2d at p. 557.) "If the taxpayer fails to respond within the thirty days, a notice of deficiency will be issued. [Citation.] If the taxpayer timely files a protest, he [or she] will be accorded an appeals office conference. . . . If a settlement is reached, the taxpayer will again be requested to sign the agreement form . . . . A determination by the appeals office, however, is final insofar as the taxpayer's appeal rights within the IRS [are concerned], and if the taxpayer continues to disagree, the statutory notice of deficiency will be sent giving the taxpayer ninety days to file a petition in the Tax Court before collection actions are begun." (*Ibid.*)

■ Thus, the preliminary findings of the tax examiner are *proposed* findings that are subject to negotiation prior to any determination of tax deficiency. (*Mills, supra*, 786 P.2d at p. 557.) Once a deficiency is assessed,

however, either by the taxpayer's consent to deficiency assessment, or by receipt of a final deficiency notice pursuant to Internal Revenue Code section 6212 et seq., the matter is final as to the IRS and subject to legal appeal in federal tax court. (*Ibid.*)

In the present case, the IRS assessed the deficiency on May 16, 1988. On this same day, IEP and IEPO signed forms No. 4549 and No. 870, acknowledging the deficiency assessment and agreeing to pay the taxes and penalties due. Issuance of a statutory notice of deficiency pursuant to Internal Revenue Code section 6212 was therefore not required. Against this background, we consider the issue raised by the parties.

### 2. Commencement of Statute of Limitations

Section 339, subdivision 1, provides that "[a]n action upon a contract, obligation or liability not founded upon an instrument in writing, except as provided in Section 2725 of the Commercial Code or subdivision 2 of Section 337 of this code; or an action founded upon a contract, obligation or liability, evidenced by a certificate, or abstract or guaranty of title of real property, or by a policy of title insurance; provided, that the cause of action upon a contract, obligation or liability evidenced by a certificate, or abstract or guaranty of title of real property or policy of title insurance shall not be deemed to have accrued until the discovery of the loss or damage suffered by the aggrieved party thereunder." Although the statute does not specifically require actual injury to commence its limitations period, cases interpreting the statute have inferred such a requirement in professional malpractice actions. The actual injury requirement for accountant malpractice cases was foreshadowed in *Moonie, supra,* 256 Cal.App.2d 361, in which the plaintiff sued his accountant for negligence following a deficiency assessment by the IRS.

The *Moonie* court phrased the issue as whether "the statute of limitations in an action for alleged malpractice by an accountant start[ed] to run from the alleged negligent act, from discovery of the negligence, or from the date when defendant was notified of the income tax penalty assessment" following receipt of the notice of final deficiency assessment from the IRS. (*Moonie, supra,* 256 Cal.App.2d at p. 361.) The court concluded that "[the taxpayer] at all times was liable for the deficiency but the deficiency in itself did not cause injury for which he could recover against [the accountant]. It was the assessment of the penalty due to [the accountant's] alleged negligence which gave [the taxpayer] a cause of action against [the accountant]." (*Id.,* at p. 364.)

The express requirement of *actual injury*, in addition to *discovery* of negligence, to commence the running of the limitations period under section 339, subdivision 1, was not adopted by the courts until four years after

*Moonie* was decided.[1] The rule was first imposed in 1971 in companion cases discussing the statute of limitations in attorney malpractice actions, which were then governed by section 339, subdivision 1. (*Neel* v. *Magana, Olney, Levy,Cathcart & Gelfand* (1971) 6 Cal.3d 176 [98 Cal.Rptr. 837, 491 P.2d 421] [hereafter *Neel*]; *Budd* v. *Nixen* (1971) 6 Cal.3d 195 [98 Cal.Rptr. 849, 491 P.2d 433] [hereafter *Budd*].)

The *Neel* court held that the statute of limitations for professional malpractice under section 339, subdivision 1, commences on discovery of the cause of action. (*Neel, supra,* 6 Cal.3d at pp. 187-188.) The *Budd* court reviewed the statute of limitations for professional malpractice in the context of a client suing his attorney for the failure to assert an important defense in an answer to a breach of contract action. The court held that in addition to discovery of the negligent conduct, a client must prove he or she was actually damaged by the negligence in order to assert a cause of action for negligence. (6 Cal.3d at p. 201.) The *Budd* court's requirement of damage in addition to discovery of the malpractice was based on the reasoning that "[i]f the allegedly negligent conduct does not cause damage, it generates no cause of action in tort. (See *Developments in the Law—Statute of Limitations* (1950) 63 Harv.L.Rev. 1177, 1201.) The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence. [Citations.] Hence, until the client suffers appreciable harm as a consequence of his attorney's negligence, the client cannot establish a cause of action for malpractice." (*Budd, supra,* 6 Cal.3d at p. 200, fn. omitted.) The *Budd* court emphasized, therefore, that the focus of the limitations period for legal malpractice actions should be on the fact of damage giving rise to the professional liability, not the amount of inchoate monetary damages that may have been incurred after the initial discovery of the malpractice. (*Budd, supra,* 6 Cal.3d at pp. 200-201.)

After determining that both discovery and appreciable harm are required to commence the statute of limitations in a professional malpractice action, the *Budd* court remanded the case for a determination of whether the plaintiff suffered appreciable damage when he incurred attorney fees at the time of the trial in the contract action, or not until the date of formal entry of judgment in that action. The *Budd* court observed: "[The] plaintiff maintains

---

[1]More recent cases applying the "discovery plus actual injury" rule in accountant malpractice cases, where the accountant has negligently filed a tax return, have explained the *Moonie* holding: "The client's cause of action accrued when he learned of the accountant's negligence through the notice that a penalty was to be assessed against him. [Citation.] The client suffered . . . 'appreciable harm,' when he became *liable* for a tax penalty . . . ." (*Schrader, supra,* 8 Cal.App.4th at p. 1687, italics added.)

that he did not suffer damage until the formal entry of judgment in the [contract] suit against him. In that event, since judgment was not entered until November 4, 1965, plaintiff's action in the present case would not be barred by the statute of limitations. If plaintiff's action in tort had not earlier accrued, it at least matured on entry of judgment because he clearly then became obligated to pay a considerable sum to the broker or to post a bond on appeal." (6 Cal.3d at p. 202.)

Following the *Budd* decision, the Legislature codified the "discovery plus actual injury" rule in Code of Civil Procedure section 340.6, the statute of limitations that governs attorney malpractice actions. Thereafter, in *Laird* v. *Blacker* (1992) 2 Cal.4th 606, 612 [7 Cal.Rptr.2d 550, 828 P.2d 691] (hereafter *Laird*), we resolved a conflict in the Courts of Appeal over whether the statute of limitations in attorney malpractice actions commences on final judgment in the underlying action on which the malpractice action is based, or whether the limitations period is tolled until the appeal of right is resolved.

In agreeing with Feddersen's assertion that actual injury occurred when IEP and IEPO were first notified by the IRS that IEPO might be disqualified as a DISC, the Court of Appeal reasoned that IEP and IEPO ignored the discovery and actual injury rule imposed by the above case law interpreting section 339, subdivision 1, and sought, by implication, to revive the law of "irremediable damage," whereby a cause of action would not accrue until a final disposition or judgment had been rendered. The Court of Appeal specifically noted that we recently rejected the "irremediable damage" rule in *Laird*, *supra*, 2 Cal.4th 606. Both Feddersen and the Court of Appeal, however, misread *Laird* and its progeny and confuse final notice of deficiency assessment with "irremediability."

In *Laird,* the plaintiff's claim against her former attorney was based on dismissal of her underlying action for failure to timely prosecute the action. The plaintiff argued that the statute of limitations for attorney malpractice (Code Civ. Proc., § 340.6) should not commence on final judgment of the underlying action, but should be tolled until *all* appellate review has been exhausted and the result "irremediable." A majority of this court disagreed, and held that the applicable statute of limitations commenced when the plaintiffs had knowledge of the "fact" of damage—i.e., when the underlying action was dismissed as a result of the attorney's negligence, and not, as plaintiff argued, on finality of a subsequent appeal. (*Laird*, *supra*, 2 Cal.4th at p. 615.)

In rejecting the plaintiff's assertion that actual injury did not occur until completion of the appeal, or the time the malpractice became "irremediable,"

we observed in *Laird* that such an interpretation of the statute would mean that the requisite limitations period would be tolled until the negligent attorney's error could be remedied or when the appellate process had been exhausted. We pointed out that the discovery and actual injury rule implicitly rejected "irremediable damage" as the point to commence the limitations period because actual injury usually occurred before the harm became irremediable in the sense that an appeal or other appellate process was finalized. (*Laird, supra,* 2 Cal.4th at pp. 615-617.) Thus we clearly distinguished between the concepts of actual injury and irremediable harm.

Our rejection in *Laird* of the "irremediable damage" rule was recently followed in *Schrader, supra,* 8 Cal.App.4th 1679, in which the defendant accountants argued the plaintiffs' cause of action for professional negligence accrued no later than the day the plaintiffs received the statutory notice of deficiency assessment from the IRS. The *Schrader* plaintiffs asserted the statute was tolled while they pursued administrative appellate remedies. (*Id.,* at p. 1681.)

The *Schrader* court rejected the plaintiffs' contention and instead applied *Laird's* reasoning to conclude section 339, subdivision 1, is not tolled while the taxpayer pursues administrative appellate remedies. (*Schrader, supra,* 8 Cal.App.4th at pp. 1686-1687.) In so doing, the *Schrader* court observed that the plaintiffs' argument had been "fatally undercut by the holding in *Laird* v. *Blacker.*" (*Schrader, supra,* 8 Cal.App.4th at p. 1685.) The court pointed out that *Laird* specifically disapproved the line of cases holding that the commencement of the statute of limitations was tolled until the appellate process had been exhausted, or when a plaintiff's damages became "irremediable." (*Schrader, supra,* 8 Cal.App.4th at p.1684; *Laird, supra,* 2 Cal.4th at pp. 616-617.)

The focus of the *Schrader* case, therefore, was on rejection of "irremediable damage" as the point to commence the statute of limitations. Feddersen and the Court of Appeal, however, read *Schrader* as supporting their assertion that equating the date of deficiency assessment with the date of actual injury erroneously focuses on the point when actual injury is "irremediable," whereas the focus of determining when actual injury occurred should be on the date the client received notice of the injury.

*Schrader,* however, is of no assistance to Feddersen. The court did not discuss whether actual injury was sustained prior to the notice of deficiency as a result of the costs incurred in hiring other professionals to assist in the audit, or at the time the deficiency was assessed by the IRS. Although the

*Schrader* court noted that the plaintiffs *discovered* their cause of action in 1986 when they "concluded that the defendants had been negligent" in their tax advice (8 Cal.App.4th at p. 1682), the court did not discuss the point of *actual injury* except to note that defendants had argued that actual injury occurred no later than the date the plaintiffs received a notice of final adjustment and deficiency assessment from the IRS. (*Ibid.*)

It appears that Feddersen and the Court of Appeal confused the *determination* of tax liability with *finalization* of the audit process, at which point the tax deficiency is actually assessed. The deficiency assessment serves as a *finalization* of the audit process and the commencement of actual injury because it is the trigger that allows the IRS to collect amounts due and the point at which the accountant's alleged negligence has caused harm to the taxpayer. Contrary to both Feddersen and the Court of Appeal, the date of deficiency assessment is not the point of "irremediability" in the *Laird* sense because it is not the equivalent to a final judgment. Indeed, the taxpayer has 90 days from receipt of the notice of deficiency to file a petition for redetermination of the deficiency. (Int.Rev. Code, § 6213(a).)

Alternatively, Feddersen and the Court of Appeal also rely on *McKeown, supra,* 194 Cal.App.3d 1225, as authority to conclude that plaintiff's payment of professional fees to Feddersen and company lawyers throughout the audit process amounted to actual injury under section 339, subdivision 1. Our reading of *McKeown* compels a different interpretation.

In *McKeown, supra,* 194 Cal.App.3d 1225, the taxpayer plaintiffs received a statutory notice of deficiency for taxes owed following an audit of the plaintiffs' corporation. One month later, the plaintiffs paid the defendant, their attorney, a $1,000 retainer to represent them in a tax court appeal challenging the deficiency notice. The plaintiffs did not file their lawsuit against their accountant until 1982, nearly five years after receipt of the deficiency notice. (*Id.,* at p. 1228.)

The trial court in *McKeown* granted the defendant's summary judgment motion on statute of limitations grounds and the Court of Appeal affirmed, concluding that the plaintiffs had suffered actual injury at least as early as January 1977 when they paid attorney fees for representation in the tax court appeal following notice of deficiency assessment. (*McKeown, supra,* 194 Cal.App.3d at p. 1230.) The *McKeown* court rejected the McKeowns' argument that they had not suffered actual injury until the tax court judgment became final. (See *Schrader, supra,* 8 Cal.App.4th at p. 1686.) As observed in *Schrader, supra,* 8 Cal.App.4th 1686, "[a]lthough the court in *McKeown*

did not disapprove of the 'irremediable injury' test, its holding that the plaintiffs suffered 'irremediable injury' once they acted on the erroneous tax advice is fully in keeping with the holding in *Laird* v. *Blacker* . . . to the extent that the *McKeown* court concluded that the possibility of seeking administrative review from an unfavorable IRS ruling and even challenging an adverse administrative decision in a proper judicial forum, i.e., Tax Court or United States District Court, did not negate the fact of actual (and irremediable) injury to plaintiffs caused by their acting on such faulty advice."

"The court in *McKeown* distinguished the McKeowns' situation from cases in which *attorney* errors during the course of litigation conceivably could be corrected by subsequent motion or appeal, in which cases the error became irremediable only when the adverse determination had become final, or the remedial motion had been denied. [Citation.] [The *McKeown* court] noted that in the McKeowns' case, the bank's allegedly erroneous advice could not be remedied by the tax court litigation. [Citation.] This portion of the *McKeown* case, of course, is now no longer good law, given the holding in *Laird* v. *Blacker* [citation]." (*Schrader, supra,* 8 Cal.App.4th at p. 1687, fn. omitted.)

Thus, contrary to the Court of Appeal and Feddersen, *McKeown* simply held that section 339, subdivision 1, was not tolled until the tax court judgment became final. Indeed, as plaintiffs point out, the *McKeown* court impliedly held that the action for accountant malpractice accrued when the plaintiffs were notified of the tax deficiency by the IRS. As the court reasoned: "The taxpayer to whom a notice of deficiency is sent is put to the choice of paying the deficiency, incurring the expense of petitioning for redetermination, or facing collection by the government. (Int. Rev. Code, § 6213(a) & (c).) [The plaintiffs] had at that point suffered [actual] harm." (*McKeown, supra,* 194 Cal.App.3d at p. 1229, fn. omitted.)

Feddersen also relies on *Yandell* v. *Baker* (1968) 258 Cal.App.2d 308 [65 Cal.Rptr. 606], in support of its assertion that the statute of limitations commenced either in 1983 and 1984, when Feddersen filed the tax returns in question, in 1986, when IRS Agent Binner first informed IEPO that it might be subject to a deficiency assessment based on the negligent preparation of its 1983 and 1984 returns, or, at the latest, in June 1987, when the proposed audit report was sent to IEP and IEPO.

Indeed, the *Yandell* court held that the statute of limitations under former section 339, subdivision 1, commenced "from the time of the negligent act

rather than from the time of discovery of the injury." (*Yandell* v. *Baker*, *supra*, 258 Cal.App.2d at p. 311.) Thus, the court held: "Once . . . [the] assets were distributed, the liability for payment of ordinary income rates, rather than capital gains rates, arose and the damage was done—even though the amount of damage or liability could not be determined until the [IRS] acted later." (*Id.*, at p. 314.)

*Yandell*, however, was decided before this court determined that a cause of action for professional malpractice does not accrue until discovery of the negligent act. In fact, we specifically disapproved its holding. (*Neel, supra*, 6 Cal.3d at p. 190, fn. 29.) As the *Schrader* court observed, *Yandell* "was decided before the California Supreme Court held that a cause of action for malpractice does not accrue until the plaintiff knows, or should know, of the negligent act. [Citation]. Therefore, the emphasis in *Yandell* on the date of the negligent act . . . is now, after *Neel*, simply irrelevant; what is relevant is the date by which the plaintiff should know or have known of the injury caused by the negligent act and when he or she had sustained appreciable and actual damage." (*Schrader, supra*, 8 Cal.App.4th at p. 1686, fn. 2.)

We have recently held that it is the disposition of a case that triggers the running of the statute of limitations in professional negligence suits. (*ITT Small Business Finance Corp.* v. *Niles* (1994) 9 Cal.4th 245 [36 Cal.Rptr.2d 552, 885 P.2d 965] [hereafter *ITT*].) Although neither *Budd* nor *Laird* addressed the limitations question in the context of a second, underlying action pending at the time the statute of limitations period expired for professional malpractice, we applied the reasoning of *Budd* and *Laird* to transactional legal malpractice cases in which litigation is frequently the result of the legal malpractice. In *ITT*, we held that until bankruptcy litigation concerning the effectiveness of loan documents is settled, the question whether the attorney has actually committed malpractice has not been resolved. (*ITT, supra*, 9 Cal.4th at pp. 257-258.) The court observed in *ITT* that the question whether the plaintiff suffered actual injury as a result of the attorney's preparation of the loan documents is contingent on the outcome of the adversary proceeding. (*Id.,* at p. 258.) Therefore, *ITT* concluded, the statute of limitations starts to run once the adversary proceeding is complete. (*Ibid.*) Here, the assessment of the tax deficiency is the equivalent of the settlement in *ITT*, because the question whether the taxpayer suffered actual injury as a result of the accountant's allegedly negligent preparation of the tax returns is contingent on the outcome of the audit.

Thus, the reasoning of *Laird* and *ITT* apply with equal force in cases involving the negligent filing of tax returns, where the alleged malpractice is

not discovered until the time of the audit, and the malpractice tort is not complete until the audit is finalized. The taxpayer's tax returns may have been selected for audit for a number of reasons, some unrelated to the alleged accountant malpractice. Indeed, "actual injury" represents a legal term of art which recognizes that an inchoate or potential injury cannot give rise to a professional malpractice action until there has been an actual determination that the accountant's alleged negligence is related to the deficiency assessment. Once the audit process is finalized, however, the harm caused by the accountant's negligence is no longer contingent and the taxpayer's cause of action in tort for alleged malpractice against the accountant accrues under section 339, subdivision 1.

Therefore, in the present case, actual injury occurred when the IRS issued its penalty tax assessment on May 16, 1988, rather than when IEPO withdrew its settlement offer in an unrelated lawsuit, or when the company's bank reduced its line of credit by $200,000 in anticipation of IEPO's potential tax liability. Although these two latter events may represent palpable harm caused by the malpractice of the accountant, they are based on a *tentative* assessment of *potential liability* only. Although Feddersen's alleged negligence may have been "discovered" during the audit, such potential liability could not amount to actual harm until the date of the deficiency tax assessment or finality of the audit process.

The foregoing rule both conserves judicial resources and avoids forcing the client to sue the allegedly negligent accountant for malpractice while the audit is pending. It also avoids requiring the client to allege facts in the negligence action that could be used against him or her in the audit, without first allowing the accountant to correct the error (or mitigate the consequences thereof) during the audit process. (See *Ackerman* v. *Price Waterhouse* (1992) 156 Misc.2d 865 [591 N.Y.S.2d 936, 941], affd., 198 A.D.2d 1 [604 N.Y.S.2d 721] ["general rule that statute of limitations for accountant malpractice does not begin to run until a tax deficiency is assessed protects federal tax preparers from the prejudice of needless litigation expense on suits which must later be abandoned because no damage ensued, after occasioning an entirely wasted investment of court resources"].)

3. *Other-state Cases*

Authority from other jurisdictions favors a rule whereby the limitations period for the tort of accountant malpractice regarding tax advice does not commence until the taxing authority assesses a deficiency. (See e.g., *Mills, supra,* 768 P.2d at p. 556; *Thomas* v. *Cleary* (Alaska 1989) 768 P.2d 1090,

1093-1094; *Strieb* v. *Viegel* (1985) 109 Idaho 174 [706 P.2d 63, 67]; *Chisholm* v. *Scott* (1974) 86 N.M. 707 [526 P.2d 1300, 1301-1302]; *Sladky* v. *Lomax* (1988) 43 Ohio App.3d 4 [538 N.E.2d 1089, 1090]; *Atkins* v. *Crosland* (Tex. 1967) 417 S.W.2d 150, 153 [26 A.L.R.3d 1431].) The general rule in these cases is that "the statute [of limitations for accountant malpractice] does not begin to run until a tax deficiency is assessed because there is no injury to the plaintiff prior to that time; i.e., there is not a completed tort until the IRS assesses a deficiency." (*Mills, supra,* 768 P.2d at p. 556.)

As Feddersen observes, some authority from other jurisdictions holds that the statute of limitations starts to run on the first indication that the accountant's mistake in preparing the tax return may lead to adverse action by the IRS. (See, e.g., *Ackerman* v. *Price Waterhouse* (1994) 84 N.Y.2d 535 [620 N.Y.S.2d 318] [accountant malpractice action accrues upon client's receipt of accountant's skill and advice]; *Klosure* v. *Johnson, Grant & Co.* (1988) 229 Neb. 369 [427 N.W.2d 44] [two-year statute of limitations for accountant malpractice commences when plaintiff told by accountant that company did not qualify for DISC status under Internal Revenue Code]; *Harvey* v. *Dixie Graphics* (La. 1991) 580 So.2d 518 [taxpayer sustained actual injury under accountant malpractice statute of limitations when he learned during IRS audit that IRS disagreed with taxpayer's accountants].)

We are not persuaded. These cases would commence the limitations period when actual injury is still speculative and deficiency assessment uncertain, defeating the purpose of California's "discovery plus actual injury rule." Moreover, as the *Mills* court observed, the goal of a statute of limitations is to prevent stale claims. By using the date of deficiency assessment or notice of deficiency assessment, as the date of actual injury, we further this goal. As set forth above, the IRS must assess a tax deficiency within three years from the date of the tax return, unless the parties agree to extend the assessment period. Most taxpayers are likely to contact the accountant who prepared the returns in question for assistance in the audit process. If the taxpayer were required to file suit against the accountant at this time, the effort to clarify any mistakes in filing would be frustrated. (*Mills, supra,* 768 P.2d at pp. 557, 558.)

The use of the date of deficiency assessment to mark the date of actual injury in accountant malpractice cases provides the parties with a bright line that, once crossed, commences the limitations period under section 339, subdivision 1, and therefore provides certainty in terms of the statute's application. Obviously, in some cases injury will be clear before the notice of deficiency is given to the taxpayer. But uniformity in application serves a

more important function when interpreting statutes of limitation than does the identification of the precise point at which some harm might be said to have occurred, even if negative collateral consequences might arise from the *tentative* assessment of additional tax liability.

CONCLUSION

We conclude that the statute of limitations in an accountant malpractice case alleging the negligent preparation of tax returns commences when the tax deficiency is assessed by the IRS. In the present case, the IRS presented IEP and IEPO with its final deficiency assessment on May 16, 1988. Accordingly, the two-year statute of limitations provided in section 339, subdivision 1, began to run at that time, and this suit, filed on May 15, 1990, was timely. We conclude, therefore, that the Court of Appeal judgment should be reversed and remanded for further proceedings consistent with this holding.

Because we determine that the statute of limitations commences on the date of deficiency assessment, we do not address IEP's alternative argument that the statute should be tolled during the "continuous representation" of the accountant. We believe any broadening of the continuous representation rule should come from the Legislature. We also deny Feddersen's request to strike IEP's reply brief and have chosen instead to exercise our discretion to disregard any defects and consider the brief to the extent it was properly prepared. (See Cal. Rules of Court, rule 18.)

The judgment of the Court of Appeal is reversed.

Arabian, J., Baxter, J., George, J., and Werdegar, J., concurred.

MOSK, J.—I concur in the result, holding that the claim of accountant malpractice was timely.

I concur in the reasoning only under compulsion of *Laird* v. *Blacker* (1992) 2 Cal.4th 606 [7 Cal.Rptr.2d 550, 828 P.2d 691], on which the majority rely in concluding that the statute of limitations began running on the date of the deficiency assessment against plaintiff.

I continue, however, to prefer the views expressed in my dissent in *Laird* v. *Blacker, supra,* 2 Cal.4th at pages 621-628. As explained therein, to force malpractice plaintiffs to file their actions before they know the outcome of the case on which their claim is based does not promote judicial economy. The status of *the* malpractice claim is uncertain until administrative and

judicial procedures for review are exhausted. Obviously, if the client should ultimately prevail in the underlying suit, the malpractice claim may well become moot for lack of damages.

Thus I believe that "actual injury" under Code of Civil Procedure section 339, subdivision 1, should not be deemed to occur until the taxpayer has exhausted administrative and judicial remedies and has suffered irremediable damage. As the majority observe, the date of the deficiency assessment against this plaintiff was not the point of "irremediability" because it is not equivalent to a final judgment; the taxpayer has 90 days from receipt of the notice of deficiency to file a petition for redetermination of the deficiency and may seek further administrative and judicial review. In the present case, plaintiff did not seek review. Accordingly, I would hold that the statute of limitations began running only when the deficiency became final.

**KENNARD, J.,** Concurring and Dissenting.—How long after discovering a costly mistake in a federal income tax return may the taxpayer wait to bring a malpractice action against the accountant who prepared the return? For actions asserting malpractice by professionals other than attorneys or health care providers, Code of Civil Procedure section 339, subdivision 1, provides a two-year limitations period. In *Budd* v. *Nixen* (1971) 6 Cal.3d 195, 201 [98 Cal.Rptr. 849, 491 P.2d 433] (hereafter *Budd*), this court decided that the two-year limitations period for professional malpractice actions begins to run upon discovery of the malpractice and the occurrence of "[a]ny appreciable and actual harm."

The majority holds that an accountant's negligence in the preparation of a federal income tax return causes "appreciable and actual harm" only when the Internal Revenue Service (IRS) assesses a tax deficiency.

The majority is wrong. Under *Budd, supra,* 6 Cal.3d 195, the term "appreciable and actual harm" includes any nontrivial monetary loss or expense proximately caused by a professional's negligence. This is consistent with the Legislature's determination in Civil Code section 3333 that the measure of damages in negligence cases is "the amount which will compensate for all the detriment proximately caused" by the negligence. As applied to the situation in which an accountant's negligent preparation of a tax return results in an IRS audit, *Budd* and Civil Code section 3333 both compel the conclusion that any nontrivial costs that the client-taxpayer incurs to respond to the audit, including accounting and legal fees, constitute appreciable and actual harm attributable to the accountant's malpractice. In dismissing such costs as irrelevant or insignificant, the majority errs.

Nevertheless, I agree with the majority that the action under review here is not barred by the statute of limitations. In professional malpractice actions, the limitations period does not begin to run while the professional continues to represent the client in the matter at issue, even after the client has both discovered the negligence and suffered appreciable and actual harm. Because the record here shows that the defendant accountants represented the plaintiff clients in the IRS audit of the plaintiffs' tax returns, and that this representation continued until less than two years before plaintiffs filed suit, the action is timely.

I

In 1974, Feddersen and Company (Feddersen), an accounting firm, assisted plaintiff International Engine Parts, Inc. in setting up plaintiff I.E.P.O., Inc. (IEPO) as a "domestic international stock corporation" (DISC) to qualify for certain tax benefits. Feddersen prepared plaintiffs' 1983 and 1984 tax returns, in which plaintiffs claimed the DISC tax benefits. In 1984, the IRS began an audit of plaintiffs' returns, looking specifically at the DISC status of IEPO. Plaintiffs retained Feddersen to represent them during the audit.

In 1986, the IRS informed plaintiffs that it would disqualify IEPO as a DISC because the tax returns did not include the proper documentation of "producer loans" and inter-company pricing agreements. When plaintiffs raised the matter with Feddersen, Feddersen admitted that its accountants had "just forgot it or missed it." Feddersen advised plaintiffs that the resulting tax liability could be in the range of $300,000. Plaintiffs also consulted their attorneys on the matter, thereby incurring legal fees.

In June 1987, the IRS sent Feddersen its audit report stating that it would disqualify IEPO as a DISC and impose a tax deficiency, interest, and penalties for the tax years 1983 and 1984. Feddersen forwarded the report to plaintiffs. Plaintiffs requested and obtained extensions of time to finalize the audit because plaintiffs anticipated a refund from the audit of a separate but related entity and hoped to use the refund to partly offset the deficiency. On May 16, 1988, the audit was finalized, and the deficiency was formally assessed, when plaintiffs and the IRS signed the appropriate forms.

On May 15, 1990, plaintiffs filed this malpractice action against Feddersen. The trial court granted summary judgment for Feddersen on the basis that the action was barred by the two-year statute of limitations in Code of Civil Procedure section 339, subdivision 1. Plaintiffs appealed and the Court of Appeal affirmed. That court rejected plaintiffs' contention that there was

no actual damage until plaintiffs signed the documents finalizing the audit and accepting the deficiency assessment. The court reasoned that actual damage had occurred when Feddersen failed to document the producer loans and inter-company pricing agreements (documents that must be generated at the time the transactions occur) or, at the latest, when plaintiffs paid Feddersen to represent them in the audit and paid fees to their attorneys to advise them on the audit problem.

This court granted plaintiffs' petition for review.

## II

If the lost DISC tax benefits and the interest and penalties imposed by the IRS for underpayment of taxes were the only damages that Feddersen's negligence caused plaintiffs to suffer, I would agree with the majority that plaintiffs incurred appreciable and actual harm only when the IRS assessed the deficiency. For the reasons stated by the majority, assessment of tax deficiency is an appropriate point in time to mark the occurrence of those injuries for statute of limitations purposes. But the majority is wrong when it dismisses as unimportant or irrelevant the many other species of damage that may result from an accountant's negligence in the preparation of a business's income tax return and that often precede the deficiency assessment.

The majority here makes essentially the same mistake as in *ITT Small Business Finance Corp.* v. *Niles* (1994) 9 Cal.4th 245 [36 Cal.Rptr.2d 552, 885 P.2d 965] (hereafter *ITT*). In that case, the corporate plaintiff had alleged that its attorney's negligence in preparing loan documents had required it to engage in litigation with third parties. A majority of this court held that the limitations period began to run only when the third party litigation terminated adverse to the plaintiff corporation by settlement. As I explained in my dissent, this holding cannot be reconciled with *Budd, supra*, 6 Cal.3d 195, or with the plain meaning of the statute (Code Civ. Proc., § 340.6) that codified the holding of *Budd* for legal malpractice actions. (*ITT, supra*, 9 Cal.4th 245, 258-262 (dis. opn. of Kennard, J.).)

Attempting to rationalize its holding in *ITT, supra*, 9 Cal.4th 245, the majority now states that in attorney malpractice cases, "the question whether the attorney has actually committed malpractice has not been resolved" until the third party litigation terminates in a manner adverse to the client by judgment, settlement, or dismissal. (Maj. opn., *ante*, at p. 619.) The majority further declares that "the question whether the plaintiff [client] suffered actual injury as a result of the attorney's [malpractice] is contingent on the outcome of the [third party] proceeding." (*Ibid.*) This explanation is problematic for several reasons.

First, if the majority means that the third party proceeding will "resolve" the issues of malpractice and actual injury by operation of collateral estoppel, the majority is wrong. The doctrine of collateral estoppel, under which a determination of issues in one action precludes relitigation of the same issues in later actions, cannot be invoked against one who was not a party (or in privity with a party) to the earlier proceeding. (*Western Steamship Lines, Inc.* v. *San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 118 [32 Cal.Rptr.2d 263, 876 P.2d 1062] [stating that "a judgment cannot bind one who was not a party thereto"]; see 7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, § 298, p. 737.) Thus, litigation between a client and a third party cannot "resolve" the issue of malpractice by an attorney or accountant (or the issue of actual injury) by operation of the doctrine of collateral estoppel unless the client's attorney or accountant was a party to the earlier action, a situation that seldom occurs and did not occur in *ITT*, *supra*, 9 Cal.4th 245.

Second, it is unlikely that the issue of malpractice—that is, whether the attorney or accountant exercised the skill, knowledge, and care ordinarily possessed and exercised by members of these professions (*Flowers* v. *Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 998 [35 Cal.Rptr.2d 685, 884 P.2d 142])—will actually be litigated or decided in a third party suit. Collateral estoppel applies only if the issue decided in the earlier action was "identical" to the issue presented in the later action. (*Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 813 [122 P.2d 892]; *Bear Creek Planning Com.* v. *Title Ins. & Trust Co.* (1985) 164 Cal.App.3d 1227, 1242 [211 Cal.Rptr. 172].)

Third, a judgment in a third party action may not "resolve" issues even as between the client and the third party because the judgment may be reversed on appeal.

Finally, and perhaps most importantly, the malpractice of an attorney or accountant may severely damage the client even when the third party litigation terminates in the client's favor. As I have stated, "it defies common sense to hold, as the majority does, that a client has not sustained 'actual injury' even though the client has paid thousands, perhaps hundreds of thousands, of dollars [in litigation costs] because the attorney's malpractice has compelled the client to prosecute or defend third party litigation." (*ITT*, *supra*, 9 Cal.4th 245, 259 (dis. opn. of Kennard, J.).)

For example, an accountant's negligent preparation of a business's tax returns may trigger a full-scale audit by the IRS. In the end, the IRS may assess no deficiency because the accountant made mistakes in the government's favor that offset mistakes in the client's favor. Does this mean the

client has suffered no injury? Not at all. In responding to the audit, the client may have incurred massive expenses, including legal fees, accountant fees, and the time expended by the client's own employees. In addition, the audit may disclose the permanent loss of tax benefits that should have been but, because of the accountant's negligence, were not claimed in the client's return. Thus, I cannot agree that the issue of actual harm is "contingent on the outcome of the audit." (Maj. opn., *ante*, at p. 619.)

The error in the majority's analysis is further illustrated by examination of the case law allowing recovery of attorney fees incurred in third party litigation caused by the "tort of another." This court has stated the rule in these terms: "A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred. [Citations.]" (*Prentice* v. *North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618, 620 [30 Cal.Rptr. 821, 381 P.2d 645]; see also, Rest.2d Torts, § 914, subd. (2).) The "tort of another" rule does not require that the claimant be unsuccessful in the third party litigation. On the contrary, courts applying the rule have upheld damage awards for attorney fees incurred in third party litigation that terminated in favor of the party claiming those fees. (E.g., *Saunders* v. *Cariss* (1990) 224 Cal.App.3d 905, 909-910 [274 Cal.Rptr. 186]; *Slaughter* v. *Legal Process & Courier Service* (1984) 162 Cal.App.3d 1236, 1251-1252 [209 Cal.Rptr. 189]; *Brousseau* v. *Jarrett* (1977) 73 Cal.App.3d 864, 871 [141 Cal.Rptr. 200]; *Nilson-Newey & Co.* v. *Ballou* (6th Cir. 1988) 839 F.2d 1171, 1177 ; see also *Moe* v. *Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289, 303 [98 Cal.Rptr. 547] [stating that plaintiff's lack of success in the third party action was "of no legal importance"].)

Here, a trier of fact might find, were the matter fully litigated, that Feddersen's negligence in the preparation of plaintiffs' tax returns triggered the IRS audit or at least made that audit longer or more costly than it otherwise would have been. Even if plaintiffs had somehow prevailed in the audit, and the IRS had assessed no deficiency, the audit-related costs, to the extent they are directly attributable to the malpractice, should be recoverable under the "tort of another" rule.

For all these reasons, I would hold that plaintiffs suffered appreciable and actual harm for purposes of the statute of limitations when they incurred any nontrivial audit-related costs as a result of Feddersen's negligence in preparing plaintiffs' tax returns. To the extent the majority holds otherwise, I respectfully disagree.

## III

Nevertheless, the majority reaches the correct result in this case when it holds that plaintiffs' action against Feddersen is not barred by the statute of limitations. The result is correct because of the "continuous representation" or "continuing relationship" rule, under which the statute of limitations on a cause of action for professional malpractice does not begin to run while the professional continues to render services to the injured client in relation to the matter at issue.

As I shall explain, California courts developed the "continuous representation" rule in medical malpractice actions as a corollary to the "discovery" rule, which precludes the running of a statute of limitations while the plaintiff is justifiably ignorant of the injury and its negligent cause. The "continuous representation" rule has been applied in actions alleging negligence by accountants and attorneys, and the Legislature has expressly approved and adopted it in Code of Civil Procedure section 340.6, subdivision (a)(2), which governs actions for legal malpractice. In its statutory form, the rule has assumed significance independent of its origins as an aspect of the "discovery" rule, so that the statute of limitations for attorney malpractice will not run during the period of continuing professional representation even when the client is fully aware of both the attorney's negligence and the resulting harm. Consistent with the policy underlying the rule as the Legislature has embraced it, I would hold that in a negligence action against an accountant, the statute of limitations does not begin to run while the accountant continues to represent the client in relation to the matter at issue.

### A. *Medical Malpractice Cases*

In California, both the "discovery" rule and the "continuous representation" rule may be traced to this court's landmark decision in *Huysman* v. *Kirsch* (1936) 6 Cal.2d 302 [57 P.2d 908]. There, a patient sued a surgeon for damages resulting from the surgeon's negligence in leaving a rubber drainage tube in the patient's body. The surgeon left the tube in the patient's body during an operation performed on January 3, 1931, and did not remove it until September 26, 1932. (*Id.* at p. 305.) The patient filed suit against the surgeon on January 7, 1933. The trial court dismissed the action, ruling that the one-year limitations period for personal injury actions began to run on the date of the plaintiff's injury, that the plaintiff had been injured on the date of the first operation (Jan. 3, 1931), and consequently that the action was barred by the statute of limitations. (*Ibid.*)

Noting that in the workers' compensation arena courts had adopted the principle that "the statute of limitations should not run against an injured employee's right to compensation during the time said person was in ignorance of the cause of his disability and could not with reasonable care and diligence ascertain such cause," this court concluded that the same principle should govern actions for medical malpractice. (*Huysman* v. *Kirsch, supra,* 6 Cal.2d 302, 312.) Accordingly, this court reversed the trial court's judgment.

The rationale of the "continuous representation" rule appears in a part of the *Huysman* opinion quoting these words from an earlier Ohio decision: " 'Indeed, it would be inconsistent to say, that the plaintiff might sue for her injuries while the surgeon was still in charge of the case and advising and assuring her that proper patience would witness a complete recovery. It would be trifling with the law and the courts to exact compliance with such a rule, in order to have a standing in court for the vindication of her rights. It would impose upon her an improper burden to hold, that in order to prevent the statute from running against her right of action, she must sue while she was following the advice of the surgeon and upon which she all the time relied.' " (*Huysman* v. *Kirsch, supra,* 6 Cal.2d 302, 309, quoting *Gillette* v. *Tucker* (1902) 67 Ohio St. 106 [65 N.E. 865, 871].)

Later cases viewed the continuing doctor-patient relationship primarily as a justification for the patient's failure to investigate facts that would otherwise have alerted the patient to the possibility of the doctor's negligence. (See, e.g., *Stafford* v. *Schultz* (1954) 42 Cal.2d 767, 778 [270 P.2d 1] [stating that "the fiduciary relationship of physician and patient excused plaintiff from greater diligence in determining the cause of his injury"]; *Myers* v. *Stevenson* (1954) 125 Cal.App.2d 399, 401-402[270 P.2d 885] [stating that the plaintiff is "not ordinarily put on notice of the negligent conduct of the physician upon whose skill, judgment and advice he continues to rely"].) Although I have found no case directly so holding, some decisions contain dictum stating that the statute of limitations begins to run on a medical malpractice claim once the patient acquires actual knowledge of both the injury and its negligent cause even though the patient elects to continue treatment with the same doctor. (See *Sanchez* v. *South Hoover Hospital* (1976) 18 Cal.3d 93, 97 [132 Cal.Rptr. 657, 553 P.2d 1129]; *Mock* v. *Santa Monica Hospital* (1960) 187 Cal.App.2d 57, 64 [9 Cal.Rptr. 555].)

In 1970, the Legislature established a special limitations provision for medical malpractice—Code of Civil Procedure section 340.5. (Stats. 1970, ch. 360, § 1, p. 772.) Under this provision, the patient is generally required to commence the malpractice action within four years after the date of

injury, or one year after the date of discovery, whichever occurs first. (*Ibid.*) Although the Legislature did not expressly codify the "continuous representation" rule, courts in medical malpractice actions still use the rule to determine the date of which the patient will be deemed to have discovered the injury. (See, e.g., *Gray* v. *Reeves* (1977) 76 Cal.App.3d 567, 577, fn. 3 [142 Cal.Rptr. 716].)

## B. *Legal Malpractice Cases*

After developing the "discovery" and "continuous representation" rules for medical malpractice actions, courts eventually applied them also to actions alleging attorney malpractice. The leading case is *Neel* v. *Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176 [98 Cal.Rptr. 837, 491 P.2d 421] (hereafter *Neel*), in which this court established that in legal malpractice actions the statute of limitations does not begin to run until the client has discovered, or through the exercise of diligence should have discovered, both the attorney's negligent act and the resulting damage. (*Id.* at p. 190.) In a footnote, we discussed the significance of a continuing attorney-client relationship in determining when the statute of limitations begins to run, concluding that if the client had not yet discovered the facts essential to the cause of action, termination of the attorney-client relationship would not commence the running of the limitations period. (*Id.* at p. 189, fn. 26.) We did not discuss the converse situation, in which discovery of the cause of action precedes termination of the attorney-client relationship.

As it had done for medical malpractice actions, the Legislature in 1977 enacted a special statute of limitations provision for attorney malpractice actions—Code of Civil Procedure section 340.6. (Stats. 1977, ch. 863, § 1, p. 2608.) Under this provision, the client is generally required to commence the legal malpractice action within one year after the plaintiff's discovery of facts constituting the wrongful act, or within four years after the wrongful act, whichever occurs first. Unlike the provision for medical malpractice actions, however, Code of Civil Procedure section 340.6 expressly addresses the "continuing relationship" issue, providing that "the period [of limitation] shall be tolled during the time that . . . [¶] (2) The attorney continues to represent the plaintiff regarding the specific subject matter in which the alleged wrongful act or omission occurred . . . ."

This court has explained that the Legislature's purpose in adopting the "continuous representation" rule in attorney malpractice cases was "to 'avoid the disruption of an attorney-client relationship by a lawsuit while enabling the attorney to correct or minimize an apparent error, and to

prevent an attorney from defeating a malpractice cause of action by continuing to represent the client until the statutory period has expired.' (Sen. Com. on Judiciary, 2d reading analysis of Assem. Bill No. 298 (1977-1978 Reg. Sess.) as amended May 17, 1977.)" (*Laird* v. *Blacker* (1992) 2 Cal.4th 606, 618 [7 Cal.Rptr.2d 550, 828 P.2d 691].)

The Courts of Appeal have stated that the "continuous representation" rule as embodied in Code of Civil Procedure section 340.6, subdivision (a)(2), is "substantially similar" to a rule fashioned by the state courts of New York. (*Gurkewitz* v. *Haberman* (1982) 137 Cal.App.3d 328, 333 [187 Cal.Rptr. 14]; accord, *Hensley* v. *Caietti* (1993) 13 Cal.App.4th 1165, 1171 [16 Cal.Rptr.2d 837]; *Shapero* v. *Fliegel* (1987) 191 Cal.App.3d 842, 847-848 [236 Cal.Rptr. 696].) Under this view, the existence of the attorney-client relationship is more than just an excuse for the client's failure to investigate evidence of legal practice. Tolling the limitations period while the attorney continues to represent the client serves also to afford the attorney an opportunity to rectify mistakes the attorney has made and to mitigate the client's losses without jeopardizing the client's right to recover damages from the attorney for any harm that is caused by the attorney's malpractice and ultimately remains unremedied.

## C. *Accountant Malpractice Cases*

The "discovery" rule of *Huysman* v. *Kirsch, supra,* 6 Cal.2d 302, was extended to accountants in *Moonie* v. *Lynch* (1967) 256 Cal.App.2d 361, 365-366 [64 Cal.Rptr. 55]. (See also, *Electronic Equipment Express, Inc.* v. *Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834, 848 [176 Cal.Rptr. 239].) The rule of "continuous representation" has likewise been applied to actions for accountant malpractice. (*Electronic Equipment Express, Inc.* v. *Donald H. Seiler & Co., supra,* 122 Cal.App.3d 834, 854-856.) The only question is whether the rule to be applied in such cases is the "continuous representation" rule as codified by the Legislature for legal malpractice cases or the somewhat more limited rule that the courts developed in medical malpractice cases.

I would apply the rule in the form that the Legislature has adopted. As this court stressed in *Neel, supra,* 6 Cal.3d 176, professional malpractice actions —whether involving doctors, lawyers, accountants, or stockbrokers—have much in common. All professionals are legally obligated to possess and employ the special knowledge and skills of their profession; a layperson who employs any professional is frequently not in a position to judge the quality of the professional's work and thus may not immediately detect malpractice,

not only because the layperson lacks the professional's skill and knowledge, but also because the professional frequently works out of the client's view; and, finally, all professionals are under a fiduciary duty to fully disclose to their clients facts materially affecting the clients' interests. (*Id.* at pp. 187-189.) Because of these similarities among the professions, the rules governing the running of the statute of limitations for the various professions should be alike unless there is a particular justification for different treatment. (See *id.* at p. 189; see also *Baright* v. *Willis* (1984) 151 Cal.App.3d 303, 311-313 [198 Cal.Rptr. 510] [citing medical malpractice precedents to resolve a statute of limitations problem in a legal malpractice case].)

The statutory form of the "continuous representation" rule is appropriate for accountant malpractice cases. Accountants no less than attorneys should be afforded an opportunity to correct their mistakes and to mitigate the client's damages without the client being compelled by the running of the statute of limitations to bring a malpractice action. Accountants no less than attorneys should be prevented from defeating a malpractice cause of action by continuing to represent the client until the statutory period has expired. Therefore, the articulation of the rule in the attorney malpractice statute should guide our construction of Code of Civil Procedure section 339, subdivision 1, as it applies to actions against an accountant for negligence in the preparation of an income tax return.[1] In this case, I would hold that the limitations period did not begin to run while Feddersen continued to represent plaintiffs in the IRS audit of plaintiffs' tax returns.

CONCLUSION

Attempting to articulate a "bright line" rule for the accrual of professional malpractice actions, the majority has instead fashioned a judicial straightjacket, into which it forces all manner of cases, no matter how poor the fit. The determination of the point of "appreciable and actual" harm is essentially a factual question, as this court acknowledged in *Budd*. The situations calling for application of the rule are simply too variable to allow the majority, by adoption of one or many "bright line" rules, to eliminate all triable issues of fact and thereby permit summary disposition by demurrer or summary judgment.

Nevertheless, the majority is correct that the plaintiffs' action here was timely. Even though plaintiffs discovered the accountant's negligence, and

---

[1]The New York courts have so concluded, extending the "continuous representation" rule developed in the context of doctor and attorney malpractice cases to malpractice cases against accountants. (*Zwecker* v. *Kulberg* (1994) 209 A.D.2d 514 [618 N.Y.S.2d 840, 841]; *Wilkin* v. *Dana R. Pickup & Co.* (1973) 74 Misc.2d 1025 [347 N.Y.S.2d 122, 124-125].)

incurred appreciable and actual harm as a result of that negligence, the limitations period did not begin to run while the accountants continued to represent plaintiffs in the IRS audit of plaintiffs' tax returns.

Respondent's petition for a rehearing was denied April 13, 1995. Kennard, J., was of the opinion that the petition should be granted.